## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 08 2017, 6:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Laura M. Longstreet
Longstreet Law, LLC
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of N.G. (Minor Child)

and

N.R.G. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 8, 2017

Court of Appeals Case No. 71A03-1703-JT-668

Appeal from the St. Joseph Probate Court

The Honorable James N. Fox, Judge

Trial Court Cause No. 71J01-1407-JT-111

**Mathias, Judge.**

[1] The St. Joseph Probate Court entered an order terminating the parental rights of N.R.G. ("Mother") to her minor daughter N.G. ("Daughter"). Mother appeals and presents four issues, which we consolidate and restate as the following two: (1) whether the trial court abused its discretion in the admission of certain evidence; and (2) whether the Indiana Department of Child Services ("DCS") presented evidence sufficient to support the trial court's decision to terminate Mother's parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Daughter was born in July 2008 to Mother and D.G.W. ("Father").[1] Mother and Father also had an older son, D.W. ("Brother"), born in 1997. On January 16, 2013, DCS received a report that Father had gotten drunk and had a physical altercation with Brother, punching the then-sixteen-year-old in the face several times, causing his nose and lip to bleed. When the boy attempted to defend himself, Father placed him in a chokehold. Father also pushed over a television set to try to hit his son. The following morning, Father claimed not to remember the fight. Daughter was at home at the time of the fight, but Mother was at work.

[4] On January 17, 2016, DCS substantiated the report and placed the children with relatives pending a detention hearing, which was held that same day. The

---

[1] Father voluntarily terminated his parental rights to Daughter and does not participate in this appeal.

trial court authorized removing the children from the parents' home and placed them with a paternal aunt ("Aunt"). DCS then filed a petition that Brother and Daughter were children in need of services ("CHINS"). The parents subsequently admitted to the material allegations of the CHINS petition.

[5] The trial court held a dispositional hearing on February 6, 2013, and issued a dispositional decree ordering Mother to: (1) allow the family case manager or other service providers to make announced or unannounced visits to the home of the children, including entrance to the home to ensure the safety of the children; (2) visit with the child on a regular basis as outlined by DCS; (3) keep all appointments with any service provider, DCS, or CASA [i.e., court appointed special advocate for the children], or good cause shall be given to the service provider and the family case manager for the missed appointment; (4) successfully complete parenting classes; (5) obtain and maintain a legal and regular source of income; (6) obtain and maintain adequate housing; and (7) maintain consistent contact with DCS and inform DCS of any changes in address or phone number within forty-eight hours in writing. Mother was later ordered to also participate in both individual and family therapy.

[6] During one of Daughter's therapy sessions, she disclosed that Brother was "sex[t]ing" her. Tr. p. 94. When asked if Brother's actions occurred during Daughter's placement with Aunt, Daughter responded that Aunt "would never let that happen," indicating that the actions occurred prior to the children's removal from the parents' home. *Id*. at 100. DCS was informed of these allegations and removed Brother from Aunt's home. During subsequent

therapy, Daughter stated that Brother held her down and performed some sexual acts, ejaculating on her. Daughter's therapist believed that, based on Daughter's descriptions of Brother's acts, that there had been vaginal penetration. Also based on Daughter's statements, it appeared that Brother's sexual abuse happened on several occasions over a significant period of time. Brother initially denied Daughter's allegations, but after being placed in a residential treatment facility, admitted to sexually molesting his sister. Brother was alleged to be a delinquent child as a result of these allegations.

[7] When DCS confronted Mother with the allegations of sexual abuse, she had a noted lack of expression. She did not say much, but did occasionally cry. The family case manager suspected that some of Mother's unusual behavior was due to intimidation by Father. Daughter's CASA stated that Mother felt herself, not Daughter, to be the victim, and felt betrayed by her son. Still, Mother was resistant to admit that her son had abused Daughter.

[8] After her removal from the home of her parents, DCS noted several concerns regarding Daughter's behavior. She had delayed speech, irregular eating habits, and was "emotionally d[y]sregulated,"[2] meaning that the smallest things might "set her off" emotionally. Tr. pp. 17. "She could go from perfectly happy to screaming in the matter of moments when something would trigger her. She'd have complete meltdowns . . . where she [was] hiding under things and crying."

---

[2] "Emotion dysregulation is the inability to flexibly respond to and manage emotions." Ryan W. Carpenter and Timothy J. Trull, *Components of Emotion Dysregulation in Borderline Personality Disorder: A Review*, Current Psychiatry Reports. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3973423/

*Id.* at 16–17. Daughter also had difficulties with personal boundaries. She would go up to strangers and ask for hugs and approach people she did not know.

[9] In September 2013, Daughter began to undergo therapy with Kaylie Bruinsma ("Bruinsma"), a licensed clinical social worker. Bruinsma also met with Mother to work with her and prepare her for an "apology session" in which she would apologize to Daughter for failing to keep her safe from the abuse by Brother. Although the first apology session went well, as Daughter gave more detailed descriptions of the abuse by Brother, Mother had trouble. She told Daughter not to talk about the abuse and to only talk about positive subjects, which was contrary to the whole point of the therapy. When Mother's attitude did not change, the joint family therapy with Daughter and Mother was canceled.

[10] In the meantime, Aunt was not following through with the training she had received from DCS. Daughter had reverted in her behavior, becoming emotionally distraught, stealing food at night, and generally causing "havoc" at Aunt's home. Tr. p. 108. Therefore, in October 2014, Daughter was removed from Aunt's care and placed in a pre-adoptive foster home.

[11] When Daughter was first placed with her non-relative foster parents, the scope of her problems was apparent. Although the child was already six years old, she did not know how to use silverware and ate with her fingers, she did not know how to properly brush her teeth, and was unable to properly wipe herself after using the bathroom. She still displayed a lack of proper boundaries,

approaching and hugging random strangers. In her foster parents' home, Daughter was afraid that her Brother or Mother would come to get her at night. To calm her fears, her foster parents had to lock her bedroom window and secure it with a dowel rod so that it could not be opened from the outside. Daughter would ask the foster parents to check the window multiple times before she felt safe that it was properly locked.

[12] In early 2015, therapist Bruinsma tried to restart family therapy with Daughter and Mother. Although Bruinsma met with Mother several times, Mother was never able to properly apologize to Daughter. Mother could generally apologize, but struggled when confronted with the specifics of Brother's abuse of Daughter.

[13] Despite being ordered by the court to maintain communication with DCS, Mother failed to do so. Mother did, however, participate in individual and family therapy. During her therapy, it was discovered that Mother suffers from post-traumatic stress disorder ("PTSD") as a result of being the victim of sexual abuse as a child herself. Mother's therapist also suspected that Mother had some sort of learning disability. Mother initially did well in individual therapy, and by July 2013, DCS recommended that she move on to family therapy. But from October 2013 through December 2013, Mother did not participate in therapy at all.

[14] Moreover, when Mother did attend therapy, her progress was slow. Mother's therapist, Barbara Hernly ("Hernly"), explained that Mother would say that she

understood something, but was then not able to retain this information and was unable to repeat the information at the next session. DCS believed that Mother had made insufficient progress over the course of the CHINS case. On January 15, 2014, the trial court held a permanency hearing and determined that Mother had not maintained consistent contact with DCS as ordered and had not participated in therapy since December of 2013.

[15] Mother was also referred to a service provider for parenting therapy and training. Still, Mother struggled. She was unable to retain what she learned during the parenting classes and unable to apply what she had learned to her visitation with Daughter. The family case manager testified that although she could not say that Mother actually failed the parenting classes, she never did well enough to move past anything other than supervised visitation. The visitations were then moved to a different service provider. The visitations remained chaotic, and Daughter often had trouble regulating her emotions. On more than one occasion, Daughter reverted to acting like a younger child during visitation with Mother, crawling on the floor. And again, if Daughter ever brought up the subject of the sexual abuse she had suffered at the hands of Brother, Mother ignored the subject.

[16] Daughter reacted poorly to the visitations with Mother, behaving badly for one or two days after the visits and being very clingy to her foster mother. Daughter also stated that she did not want to visit Mother, and would occasionally feign illness to avoid going. Accordingly, in June 2015, the visitation service provider decided that visitations should be reduced from once per week to once every

other week and take place in a therapeutic setting. The visitation supervisor testified that Mother had still not moved beyond the need for supervised visitation. The supervisor also remained concerned about Daughter's emotional reaction to Mother and Mother's inability to appropriately respond to Daughter's outbursts. On July 9, 2014, the permanency plan was changed from reunification to adoption.

[17] In foster care, Daughter's behavior improved. She was able to explain her emotions and have fewer outbursts. She was learning to better understand personal boundaries, and was less nervous and hyperactive. Daughter felt safe in foster care.

[18] On July 20, 2014, due to Mother's lack of progress and the time that had passed, DCS filed a mandatory petition to terminate Mother's parental rights, as Daughter had been out of the parents' care for fifteen out of the most recent twenty-two months.[3] The trial court held a hearing on the termination petition on September 3, 2015, and, on January 22, 2016, the trial court entered an order terminating Mother's parental rights to Daughter.

[19] Mother appealed, and, on October 6, 2016, a panel of this court held:

> [T]he trial court's findings are so sparse that we cannot discern whether it based its termination order on proper statutory

---

[3] Federal law provides that, as a condition of receiving federal funding, a state must file a petition to terminate the parental rights of the parents of a child who has been in foster care under the responsibility of the state for fifteen of the most recent twenty-two months. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 377 (Ind. Ct. App. 2006) (citing 42 U.S.C. § 675(5)(E)). Indiana Code section 31-35-2-4.5(a)(2)(B) codifies this federal requirement in Indiana. *Castro*, 842 N.E.2d at 377.

considerations. As we are not at liberty to scour the record to find evidence to support the judgment, we remand with instructions for the trial court to enter proper findings of fact and conclusions of law to support the termination of Mother's parental rights.

*In re Involuntary Termination of Parent-Child Relationship of N.G.*, 61 N.E.3d 1263, 1266 (Ind. Ct. App. 2016).

[20] On February 26, 2017, DCS filed a motion requesting that the trial court enter additional findings to support its termination order. On February 24, 2017, the trial court entered an order containing its additional findings, and on March 3, 2017, the trial court entered an amended termination order. The trial court noted in its amended termination order that Daughter had been removed from the care of the foster parents with whom she had been placed after removal from the care of Aunt, but had been placed in another pre-adoptive foster home in July 2016. Mother now appeals.

## I. Admission of Evidence

[21] Mother claims that the trial court committed reversible error in the admission of certain evidence. In addressing this claim, we note that decisions regarding the admission of evidence are entrusted to the sound discretion of the trial court, and we will not reverse that decision on appeal except for an abuse of that discretion. *D.B.M. v. Indiana Dep't of Child Servs.*, 20 N.E.3d 174, 178–79 (Ind. Ct. App. 2014). A trial court abuses its discretion when its evidentiary decision is clearly against the logic and effect of the facts and circumstances before it, or the trial court has misinterpreted the law. *Id.* at 179; *D.G.B. v. State*, 833 N.E.2d

519, 524 (Ind. Ct. App. 2005). The fact that evidence was erroneously admitted does not automatically require reversal, and we will reverse only if we conclude the admission affected a party's substantial rights. *D.B.M.*, 20 N.E.3d at 179. The admission of evidence that is merely cumulative of other evidence generally amounts to harmless error, as such admission does not affect a party's substantial rights. *Id.*

[22] Mother argues that the trial court admitted various evidence which referred to Daughter's out-of-court statements. This, she claims, was improper because the statements did not meet the requirements for admissibility under Indiana Code chapter 31-35-4, governing the admission of recorded statements of a child in termination actions, nor did they fall within any of the established exceptions to the hearsay rule.

[23] Mother, however, points to few actual examples of the evidence that she now claims was improperly admitted. Indeed, her argument mostly refers in broad terms to "evidence," "documents," and "testimony" without giving specific examples or citation to the record. *See, e.g.*, Appellant's Br. at 40 ("There is voluminous evidence in the record that the DCS'[s] witnesses frequently testified to the child's out-of-court statements."); *id.* at 41 ("Various documents filed by the DCS in the CHINS matter reference [child's] allegations [of sexual abuse by her brother]."); *id.* at 43 ("The record contains hearsay evidence of sexual abuse and hearsay evidence of statements made against mother. . . . [T]he out-of-court statements regarding the sexual abuse and statements regarding mother, were hearsay.").

[24] It is Mother's burden on appeal to support her argument with appropriate citations to the record. *See* Ind. Appellate Rule 46(A)(8)(a) ("Each contention [in the appellant's brief] must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on[.]"). We will not undertake the burden of combing and sifting through the record to find support for an appellant's argument.[4] *Clark Cty. Drainage Bd. v. Isgrigg*, 963 N.E.2d 9, 19 n.4 (Ind. Ct. App. 2012), *adhered to on reh'g*, 966 N.E.2d 678; *Wright v. Elston*, 701 N.E.2d 1227, 1230 (Ind. Ct. App. 1998), *trans. denied*. We address Mother's evidentiary argument only to the extent that she refers to specific instances of the admission of evidence.

[25] Mother first refers to the DCS progress report dated June 16, 2015, in which the DCS family case manager repeats Daughter's statements that she did not wish to visit Mother or remain in Mother's care. Mother does not provide a citation to the record where we can find such a statement. Nevertheless, we have located this report in DCS's Exhibit A. However, Mother did not object to the admission of DCS's Exhibit A. *See* Tr. p. 11 (trial court noting that DCS's Exhibit A was admitted without objection). Her argument with regard to the admissibility of this document is therefore waived. *See In re Guardianship of Hickman*, 805 N.E.2d 808, 822 (Ind. Ct. App. 2004) ("The failure to make a contemporaneous objection to the admission of evidence at trial, so as to

---

[4] Mother briefly argues that "several of DCS'[s] witnesses made . . . assertions" as to their belief in Daughter's allegations. Appellant's Br. at 40. Mother does not explain which witnesses made such assertions or where such assertions were made in the transcript. Nor does she further develop this argument. We therefore consider it waived. *See* App. R. 46(a)(8)(A).

provide the trial court an opportunity to make a final ruling on the matter in the context in which the evidence is introduced, results in waiver of the error on appeal."), *trans. denied*.

[26] Mother does refer to portions of testimony to which she did object.[5] First, she objected to testimony of the CASA that referred to the fact that the CASA had watched the interviews of Daughter at the child advocacy center. Tr. pp. 67–68. We note, however, that the CASA never actually testified to any statement made by Daughter during these interviews. The CASA testified merely that she watched those interviews. The CASA's testimony would be hearsay only if it referred to a statement made by Daughter. But counsel for DCS carefully worded her questions to the CASA and specifically asked her to answer "[w]ithout talking about what someone said on the [interview] video . . . ." Tr. p. 70. The fact that the CASA watched the interviews and testified to this fact is not, of itself, hearsay.

[27] Mother also objected to the CASA's testimony that, based on what Daughter told her, she felt that Mother was unable to properly meet Daughter's need for

---

[5] Mother argues that she objected to the admission of some evidence by moving for a continuance immediately before trial based on the late disclosure of the CASA's report, which contained references to Daughter's interview at a child advocacy center. Mother also claimed that the statements contained in this report were hearsay and inadmissible under the child hearsay statute, Indiana Code chapter 31-35-4. The trial court, however, declined to grant a continuance and indicated that it would rule on the admissibility of the evidence as it was presented. Mother's pre-trial motions were effectively motions in limine, which the trial court denied. But this did not relieve Mother of her burden to make a contemporaneous objection to the evidence she claimed was inadmissible. *See Fricke v. Gray*, 705 N.E.2d 1027, 1030 (Ind. Ct. App. 1999) (noting that a ruling on a pre-trial motion in limine is not a final ruling on the admissibility of evidence and that the party must still object to the admission of the evidence at the time it is offered), *trans. denied*.

safety. *Id*. at 71–72. It does appear that the CASA based her testimony on what Daughter told her. *See id*. at 71 (testimony of CASA stating, in response to question of how she knew Daughter was in fear for her safety with Mother, "She told me.").

[28] Even if we assume that this portion of the CASA's testimony is hearsay, it would not constitute reversible error. Erroneously admitted evidence that is merely cumulative in nature is harmless if the same or similar evidence is submitted without objection. *Homehealth, Inc. v. N. Ind. Pub. Serv. Co.*, 600 N.E.2d 970, 974 (Ind. Ct. App. 1992). Here, there was evidence admitted without objection establishing that Daughter did not feel safe in Mother's care. *See* Tr. pp. 21, 32 (testimony of child's therapist on cross-examination by Mother that Daughter felt safer out of Mother's care and that Daughter did not feel safe in Mother's care); *id*. at 59 (testimony of visitation supervisor that Daughter had issues with feeling safe and did not feel safe with Mother). Accordingly, the trial court did not commit any reversible error in overruling Mother's hearsay objection to this portion of the CASA's testimony.

[29] Lastly, Mother objected to the CASA's testimony that Daughter had finally gathered the courage to tell her Mother about the abuse she suffered at the hands of Brother.[6] Tr. pp. 88–89. Mother's objection to the CASA's testimony

---

[6] Mother also objected to the admission of the CASA's report to the extent it contained statements made by Daughter during the interviews at the child advocacy center and statements made by Daughter as related to the CASA by her foster mother. Tr. pp. 77–79. But, as Mother acknowledges, the trial court did not admit the CASA's report. *See* Appellant's Br. at 42 (noting that "the report by the CASA did not come into evidence[.]").

that Daughter had to gather the courage to tell Mother about the abuse was that the testimony was based on facts not in evidence. Mother made no objection to this testimony based on hearsay or the child hearsay statute, the grounds she now argues on appeal. A party may not object on one ground at trial and seek reversal on appeal using a different ground. *Reed v. Bethel*, 2 N.E.3d 98, 107 (Ind. Ct. App. 2014).

[30] In short, Mother has not established reversible error with regard to the trial court's admission of evidence.

## II. Termination of Parental Rights

[31] Mother also claims that the trial court clearly erred in determining that DCS met its burden to establish that termination of Mother's parental rights was proper.

*A. Applicable Law and Standard of Review*

[32] The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[33] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[34] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1260. But because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection 4(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[35] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id*. If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

### B. Conditions that Resulted in Removal

Mother argues that the trial court clearly erred in concluding that there was a reasonable probability that the conditions that resulted in Daughter's removal from the parents' home would not be remedied. When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156–57 (Ind. Ct. App. 2013), *trans. denied*. However, the trial court may disregard efforts made only shortly before termination and weigh more heavily a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[38]     Mother argues that the reason for Daughter's removal was Father attacking Brother while she was at work. She claims that she cannot be held responsible for the actions of others. But the relevant question is not only why the child was removed from her parents' care, but also whether "the reasons for placement outside the home of the parents" will be remedied. I.C. § 31-35-2-4(b)(2)(B)(i). *See also In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005) ("[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home.").

[39]     The reason for Daughter's continued placement outside of Mother's home was that Brother sexually abused Daughter. Mother had difficulty accepting Brother's actions and would change the subject when the issue was brought up by Daughter. Mother told the service providers that she thought Daughter had been happy in her care and was unaware of any sexual abuse. Daughter's own therapy was frustrated by Mother's inability or unwillingness to discuss the abuse. Mother was never able to properly apologize to Daughter for her role in failing to keep Daughter safe, which hampered Daughter's ability to feel safe with Mother. Daughter's behavior worsened around the times of her visits with Mother.

[40]     Furthermore, Mother seemed unable to benefit from the services offered to her. Mother stopped attending her individual therapy in October 2013, and did not keep in regular contact with the family case manager after that date. Mother was unable to learn or retain much from the parenting classes and had trouble

applying what was taught to her interactions with Daughter. Although Mother did regularly attend visitations, she never managed to retain enough from the services offered to her to be able to move past supervised visitations. Mother herself was the victim of sexual abuse and was unable to progress in therapy with Daughter until she addressed her own psychological problems that stemmed from this abuse, which she had not done.[7]

[41] Given our deferential standard of review in family law matters, we are unable to say that the trial court clearly erred in concluding that DCS had established by clear and convincing evidence that there was a reasonable probability that the conditions that resulted in Daughter's removal from the parents' home or the reasons for placement outside the home would not be remedied.

*C. Continuation of Parent-Child Relationship*

[42] Mother also argues that the trial court clearly erred in determining that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

[43] We first observe that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; accordingly, the trial court is required to find that only one prong of Section 4(b)(2)(B) has been established. *In re A.K.*, 924 N.E.2d at 220. We have

_____

[7] Mother briefly cites *In re V.A.*, 51 N.E. 3d 1140, 1149 (Ind. 2016), in support of her argument that the presence of a parent who has a mental illness in the home of the child is insufficient to who a risk of substantial harm to the child. *See id*. Mother argues that her mental health issues cannot form the basis of the trial court's decision to terminate her parental rights if they do not put the child in danger. But here, termination was not based solely on Mother's mental issues. And there was evidence that Mother's PTSD was a factor limiting her ability to help Daughter deal with her emotional problems.

already concluded that DCS proved that there was a reasonable probability that the conditions which resulted in the children's removal from Mother's care, or the reasons for Daughter's placement outside Mother's home would not be remedied. We therefore need not address Mother's arguments directed at the "threat" prong of Section 4(b)(2)(B). *See id*. But even if we address the "threat" prong of Section 4(b)(2)(B), Mother would not prevail.

[44] In addressing the threat prong of Section 4(b)(2)(B), the trial court must consider the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *A.D.S.*, 987 N.E.2d at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id*. DCS is not required to provide evidence ruling out all possibilities of change. *Id*. Instead it needs to establish only that a reasonable probability exists that the parent's behavior will not change. *Id*. Actual physical abuse is not required to find that there is a reasonable probability that continuation of the parent-child relationship poses a threat to a child's wellbeing, and a court need not wait until the child suffers permanent psychological or physical injury before intervening. *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005), *trans. denied*. Instead, the evidence need only show that the emotional and physical development of the child is threatened. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

[45] In addressing the threat prong, the trial court here noted that, when Daughter arrived at her foster home, she had trouble with boundaries and would approach and hug strangers. Daughter ate with her fingers instead of utensils

and had poor personal hygiene, not knowing how to properly brush her teeth or wipe herself after using the bathroom. Daughter also displayed hyper-vigilant behavior, repeatedly checking to make sure the doors to the house and the window in her bedroom were shut and locked. The foster parents eventually had to add a dowel rod to the window to reassure Daughter that her Brother or Mother could not break into the home and take her away. Although Daughter made improvements in her behavior while in the care of the foster parents, she would revert to more disruptive behavior after visits with Mother. Both the CASA and Daughter's therapist testified that they believed continuation of the parent-child relationship posed a threat to Daughter's well-being because Mother remained a trigger for Daughter's behavior.

[46] Again, under our extremely deferential standard of review, we cannot say that the trial court clearly erred in determining that there was clear and convincing evidence establishing that there was a reasonable probability that continuation of the parent-child relationship posed a threat to Daughter's well-being.

*D. Best Interests of the Child*

[47] Mother also argues that the trial court erred in concluding that termination of the parent-child relationship was in the best interests of the children. In determining what is in the best interests of the child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the parent to those of the child, and the court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*. A

recommendation by the case manager or child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal or continued placement outside the parent's home will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id* at 1158–1159.

[48] Here, the trial court found that Daughter's behavior and condition have improved considerably since being removed from her Mother and placed in foster care. Mother argues that the trial court placed too great an emphasis on permanency, implying that the trial court should have given Mother more time to participate in services. But Mother had over two and a half years to participate in services. And during this time, she failed to benefit from the parenting classes offered to her, made little progress in individual therapy, and failed to maintain consistent contact with DCS. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014) (quoting *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1235 (Ind. 2013)).

[49] Moreover, the CASA, the DCS family case manager, and Daughter's therapist all testified that, in their opinions, termination of Mother's parental rights was in Daughter's best interest. Tr. pp. 30, 84, 117. This evidence was sufficient to

support the trial court's conclusion that termination of Mother's parental rights was in the best interests of the child. *See A.D.S.*, 987 N.E.2d at 1158.

## Conclusion

The trial court did not commit reversible error in the admission of evidence Mother now claims was impermissible hearsay. The trial court did not clearly err when it determined that DCS had presented clear and convincing evidence establishing that there is a reasonable probability that the conditions that resulted in Daughter's removal from Mother's home or the reasons for her continued placement outside Mother's home would not be remedied and that the continuation of the parent-child relationship poses a threat to Daughter's well-being. Nor did the court clearly err in determining that termination of Mother's parental rights was in Daughter's best interests.

Affirmed.

Vaidik, C.J., and Crone, J., concur.